## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

**CHEUNG YIN SUN,**                                                    **PLAINTIFFS**
**LONG MEI FANG,**
**& ZONG YANG LI**


**vs.**                                    **Civil File No. 3:14–cv–01098–VLB**


**THE MASHANTUCKET PEQUOT GAMING ENTERPRISE,**
**DBA FOXWOODS RESORTS CASINO,**
**& ANNE CHEN, JEFF DeCLERCK,**
**EDWARD GASSER, GEORGE HENNINGSEN,**
**FRANK LEONE, DETECTIVE MICHAEL ROBINSON,**
**MICHAEL SANTAGATA, CHESTER SICARD,**
**INDIVIDUALLY**                                            **DEFENDANTS**


### AMENDED CIVIL COMPLAINT

### PUNTIVE DAMAGES DEMANDED

### JURY TRIAL DEMANDED


Come now the plaintiffs in the above named action, Cheung Yin Sun, Long Mei Fang and Zong Yang Li ("plaintiffs"), by and through counsel, and files this, their civil complaint against the above named defendants Mashantucket Pequot Gaming Enterprise ("Foxwoods"), and Anne Chen, Jeff DeClerk, Edward Gasser, George Henningsen, Frank Leone, Michael Robinson, Michael Santagata, and Chester Sicard in their individual capacities. Plaintiffs file this amended complaint as a matter of course under Fed. R. Civil Pro. 15(a). Due to computer error, plaintiffs' counsel inadvertently filed an earlier working draft of the complaint instead of the finalized draft. The draft they intended to file is now presented as an amended complaint.

Several typographical errors are now corrected, and minor substantive changes appear in paragraphs 13, 14, 17, 35, and new paragraph 36.

## NATURE OF THE ACTION

1.      This is a 42 U.S.C. § 1983 action. Defendants, acting under color of state law, deprived plaintiffs of their civil rights and in so doing are liable for tort–like causes of action for fraud, conversion, false imprisonment, false arrest and governmental taking of their private property without due process of law in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution. Plaintiffs seek actual and punitive damages against all defendants jointly and severally.

## JURISDICTION AND VENUE

2.      Plaintiffs asserts federal subject matter jurisdiction under 42 U.S.C. § 1983.

3.      This court has personal jurisdiction over defendants Foxwoods and the individually named defendants because they acted under color of Connecticut state law in depriving plaintiffs of their civil rights.

4.      Venue is proper because defendant Foxwoods has its place of business 39 Norwich–Westerly Road, Ledyard, Connecticut 06388 and because the events that gave rise to this cause of action took place within the Connecticut District of the United States District Court.

## PARTIES

5.      Plaintiff Cheung Yin Sun is a permanent resident Green Card holder who resides in Las Vegas, Nevada. Plaintiffs Long Mei Fong and Zong Yang Li are permanent resident Green Card holders who reside in Los Angeles, California.

6.     Defendant Foxwoods is Native American Indian casino whose principal place of business is 39 Norwich–Westerly Road, Ledyard, Connecticut 06388.

7.     Defendants referred to throughout this complaint as "Foxwood Management" are the individually named defendants Anne Chen, Jeff DeClerk and Frank Leone. Other Foxwoods Management defendants may be added to this suit upon further discovery, but these are the only named Foxwoods Management defendants at this time. The Foxwoods Management defendants may be served process at their usual place of business, which is 39 Norwich–Westerly Road, Ledyard, Connecticut 06388.

8.     There are four individually named defendants associated with the Mashantucket Pequot Tribal Nation Gaming Commission. They are Outside Counsel Edward Gasser, Chairman George Henningsen, Director of Inspections Divisions Chester Sicard, and Legal Counsel Michael Santagata. These defendants may be served process at their usual places of business.

9.     Defendant Michael Robinson is an officer of the Connecticut Department of Public Safety, ID# 903. He may be served process through the Connecticut Department of Public Safety.

**FACTUAL ALLEGATIONS**

10.     The factual allegations set forth in this complaint incorporate several exhibits by reference. The initial findings of Mashantucket Pequot Tribal Nation Gaming Commission (MPTNGC) by director Chester Sicard dated February 31, 2012 shall be referred to herein as "Exhibit A." The MPTNGC Decision of the Appeal

Hearing dated August 6, 2012 by George Henningsen shall be referred to herein as "Exhibit B." An Investigative Report prepared by officer Michael Robinson of the State of Connecticut Department of Public Safety dated December 29, 2011 shall be referred to herein as "Exhibit C." And lastly, an Escrow Agreement signed by the plaintiffs and Anne Chen, Vice President of Asian Marketing for Foxwoods, dated December 29, 2011 shall be referred to herein as "Exhibit D." Cites to these exhibits herein will include the exhibit letter and page number from the attached PDF of combined exhibits, e.g., (Exhibit B, 4) meaning the first page of Exhibit B.

11.     On or about December 24, 2011, plaintiff Cheung Yin Sun, along with two other playing partners, plaintiffs Long Mei Fang and Zong Yang Lei, deposited approximately $1.6 million dollars in shared front money with defendant Foxwoods Resorts Casino in order to play Mini–Baccarat (Exhibit A, 1). Plaintiffs won approximately $1.148 million in chips that evening while playing Mini–Baccarat on the graveyard shift. Plaintiffs won the $1.148 million honestly by using an advantage play strategy known as "edge–sorting," which will be described in more detail below. However defendants Foxwoods and Foxwoods Management refused to redeem the chips/winnings because they accused plaintiffs of cheating.

12.     When plaintiffs tried to redeem their chips/winnings, Foxwoods and Foxwoods Management said it could not pay them because it was a public holiday (it was Christmas time). Plaintiffs waited for three days in their Foxwoods hotel rooms to be paid when eventually Foxwoods security staff and managers turned up at plaintiff Cheung Yin Sun's room with Connecticut State Police officer Michael Robinson. Robinson said Foxwoods told him that Sun and the other plaintiffs had

been cheating. Initially officer Robinson was rude and quite aggressive towards Sun and he asked her to return to Foxwoods the $1,148,000 in chips plaintiffs had won. Sun insisted to Robinson that she had not been cheating and suggested he go and review the security camera footage so he could make a decision himself. Robinson then left with the casino staff, purportedly to review the footage. After about two hours, Robinson returned to Sun's room and told her and her lawyer (who by then was on the end of the telephone and who spoke with Robinson) that he did not think that she had been cheating. However he told her that he did not have the power to force the casino to pay her and that if she wanted to be paid, she would need to make a formal complaint or bring a civil law suit against Foxwoods.

13.     In point of fact, plaintiffs were not cheating. They were admittedly engaging in a form of advantage play called "edge–sorting," but edge–sorting is recognized as legal in Connecticut and other known U.S. gaming jurisdictions because it is nowhere defined as illegal by the criminal statues in Connecticut or any other known U.S. gaming jurisdictions, and criminal statues must be specific in their prohibitions in order to be constitutional. Essentially, edge–sorting is possible because all casino playing cards are cut within certain manufacturing tolerances known as "registration variances." These variances result in some percentage of all decks exhibiting asymmetrical backs to different degrees. When these variances are discernible during the normal course of play, they can strategized by the best advantage players using the technique of edge–sorting. If a skilled edge–sorter "sorts" certain cards by turning them opposite than the rest of the cards in play, they are capable of recognizing those card backs when dealt in the next shuffle, provided

the sorted cards are not reversed in the shuffling process rendering the sorts unintelligible (which incidentally is *exactly* what Foxwoods was advised to do to prevent edge–sorting, advice they chose to ignore, see Exhibit C, 23, 27). Although the rules of Mini–Baccarat do not permit players to handle the cards, plaintiffs asked and were given permission for the dealer to sort the 6, 7, 8 and 9 valued cards by turning them the opposite direction (Exhibit B, 7). Plaintiffs admittedly gained a mathematical advantage by this edge–sorting strategy, but it was an honest advantage and nowhere near as strong as the MPTNGC Decision of August 6, 2012 made it out to be. The August 6, 2012 MPTNGC decision often stated that plaintiffs were "past–posting," which implies they were placing wagers after the results were perfectly known (Exhibit B, 10, 11, 13, 17). Plaintiffs can establish the mathematical advantage of edge–sorting at Mini–Baccarat by expert witness analysis, but it was certainly not 100% perfect. Given the difficulty of identifying the most minute variances, edge–sorters are limited to estimating a range of values on a percentage basis, and always with less than perfect reading accuracy. For instance, plaintiffs could only identify a possible range of cards 6 through 9; even if they identified this range of cards perfectly the cards still had to fall in the right order for them to win. The point is: plaintiffs' mathematical advantage of edge–sorting at Mini–Baccarat was analogous to and of the same genus as card counting at blackjack,[1] the legality of which the MPTNGC recognized in its August 6, 2012 ruling (Exhibit B, 14–15).

---

[1] Most blackjack card counters have a 1 to 2% advantage. Although advanced forms of card counting (such as shuffle tracking or Ace sequencing) might have considerably stronger advantages, the

14.     Wikipedia states that *advantage gambling*, or *advantage play*, "refers to a practice of using legal ways to gain a mathematical advantage while gambling."[2] Thus, an "advantage player" by definition is not a cheater; they gain an honest advantage over casinos by way of their skill and superior knowledge of the game. Due to contract law principles, the generally accepted rule of law in every U.S. gaming jurisdiction is that advantage players can be excluded from a casino property or specific games upon discovery, or else counter–measures can be taken against them that render their advantage strategies no longer possible (like shuffling every hand to thwart card counting at blackjack). But once the advantage player is stopped from play, they are allowed to keep their winnings up to that point. One reason for this generally accepted rule is that casino gaming involves a series of contracts formed between the casino and the patron and completed with each hand.[3] Another reason for this generally accepted rule is to prevent casinos from strategizing the information they have on advantage–players by "free–rolling" them. For example, plaintiffs could very well have lost their $1.6 million in front money while attempting their edge–sorting strategy, in which case Foxwoods would certainly have kept their money and not refunded it. Advantage players know they

---

[2] http://en.wikipedia.org/wiki/Advantage_gambling, harvested July 16, 2014.

[3] For example, see Mississippi Gaming Commission ruling *Isle of Capris vs. Frederick Sigur*, 97–00071. A full report of the *Sigur* ruling may be found on the MGC website:

http://dsitspe01.its.state.ms.us/mgc%5CGamingWeb.nsf/PatronDisputes/47659A3C979BF05586256AAB0061605B/$file/isle-biloxivsigur.pdf

Note carefully the footnote on page 5, where the MGC distinguished tournament blackjack from regular blackjack: "It should be pointed out that tournaments differ from regular house blackjack in the formation of contracts. *In regular blackjack a contract is formed on each hand*. There is no contract to allow a patron to play as long as he likes or until a certain result is reached" (emphasis added).

can lose while gambling and accept this risk as part of the game. However, if Foxwoods and Foxwoods Management knew that plaintiffs were edge–sorting and let them practice their form of advantage play anyway—intending to keep their losses if they lost but not honor their winnings if they won—this would be intentional fraud. Upon information and belief, plaintiffs will show this is exactly what Foxwoods and Foxwoods Management did and intended to do.

15.    Defendants Foxwoods and Foxwoods Management not only refused to honor plaintiffs' $1.148 million in chips/winnings, they also froze their $1.6 million in front money deposits in order to coerce plaintiffs into submitting to the civil jurisdiction of the Mashantucket Pequot tribal courts. According to the MPTNGC Decision of the Appeal Hearing dated August 6, 2012, plaintiffs entered into a so–called "Agreement" following the MPGE's refusal to redeem their $1.148 million in chips/winnings, while simultaneously freezing the $1.6 million dollars in front money deposits. As part of that Agreement:

> MPGE agreed to return the approximately $1.6 million that had been deposited in the Claimants customer accounts. The Agreement left unresolved the December 25, 2011 "Patron Complaint" (which challenged the MPGE's refusal to pay (redeem) Complainant's $1.148 million in "winnings") filed with the Commission's Inspections Division, but it specified that this Commission had the "... jurisdiction and authority ..." to render a "final and non-appealable decision regarding the ultimate ownership of the chips."

(Exhibits B, 4–5; Exhibit D, 42). This entire "Agreement" is a sham. Plaintiffs never voluntarily or willingly agreed to any of these terms. Foxwoods and Foxwoods Management literally forced plaintiffs into surrendering their winnings at gunpoint, by bringing in officer Michael Robinson of the Connecticut State Police with the intent of arresting plaintiffs for cheating and using officer Robinson to seize

plaintiffs' chips/winnings and turn them over to the tribal authorities never to be returned. As for plaintiffs' $1.6 million in front money deposits, defendants Foxwoods and Foxwoods Management wrongly converted that money for three whole days by falsely imprisoning plaintiffs in their hotel rooms. When officer Robinson of the Connecticut State Police finally arrived, rather than assist plaintiffs in recovering their converted front money, he acted upon defendants' Foxwoods and Foxwoods Management's behest and forced plaintiffs to surrender their chips/winnings to an escrow agent under threat of criminal prosecution for cheating. We know this because officer Robinson himself wrote in his Investigative Report that he did not close the criminal case against plaintiffs until February 2, 2012, a full month after the Escrow Agreement was signed on December 29, 2011 (Exhibit C, 40–41; Exhibit D, 42). Evidently what happened during the interim is that officer Robinson and Foxwoods Senior Security Investigator Jeff DeClerk desperately tried to bring criminal charge against plaintiffs but failed. According to footnote 7 of the August 6, 2012 MPTNGC Decision, DeClerk met with 1) the Connecticut State's Attorney's Office in New London; 2) the U.S. Attorney's Offices for the Districts of both Connecticut and Nevada; 3) the FBI; and 4) Homeland Security—all of whom refused to prosecute (Exhibit B, 13). To reiterate: the real reason defendants brought in the Connecticut State Police was to assist them in wrongfully converting $1.6 million in front money deposits, which was part of an overall scheme to force plaintiffs to surrender their chips/winnings to the civil jurisdiction of the Mashantucket Pequot tribal courts where they had no hope whatsoever of recovery.

16. Plaintiffs were denied the right to use the independent counsel of their choice to represent them in proceedings before the MPTNGC tribal courts concerning their seized chips/winnings. This is because at the time of plaintiffs' patron dispute with Mashantucket Pequot Tribal Nation Gaming Commission, the Mashantucket Pequot Bar Association was essentially closed. Members of the Mashantucket Pequot Bar Association had to pass special bar admission tests and pay special fees, which effectively limited membership in the Bar to local counsel only. Although the Pequot tribe had a small staff of in-house attorneys to handle its transactional work, the majority of its litigation was, and still is, handled by outside local counsel. Any illusion that the MPTNGC was a fair and just tribunal was shattered when plaintiffs were denied their right to independent and effective counsel of their choice. The Fifth Amendment right to independent and effective counsel is arguably the most fundamental constitutional right there is.

17. For instance, had plaintiffs been allowed to hire the independent counsel of their choice, they likely would have introduced expert testimony to point out that other U.S. gaming jurisdictions recognize edge-sorting as legal and do not consider it cheating. In the August 6, 2012 MPTNGC Decision, the Commission ruled that it was necessary to seize the plaintiff's winnings because Foxwoods has no other way of protecting its Mini-Baccarat game from edge-sorting (Exhibit B, 16). Nothing could be further from the truth. In his book *Advantage Play for the Casino Executive*, casino consultant Bill Zender points out that had Foxwoods followed even the most basic game protection procedures routinely followed by modern casinos, such as "washing the cards" (hand scrambling the cards before inserting them into a

shuffle machine) or by using a "turn" (not placing all eight decks of cards in the same North–South orientation in their shuffle machine) plaintiffs' attempts at edge–sorting would have been easily thwarted. As Zender worded it:

> Modern procedures all but eliminate these problems from ever happening. However it's good to have this knowledge locked away in your mental arsenal of game protection information. The technique examined previously as playing sorts is something that is still happening around the gaming industry today. The details of the technique need to be kept within arms reach as long as the casino executive is responsible for games that are dealt face down to the players. I have no idea how much sort play is going on at this time but it's still possible and can be exploited, very profitably, *while being accomplished legally*.

*Advantage Play for the Casino Executive* (Self Published, 2006), 86 (emphasis added).

Casino advisor Eliot Jacobson, PhD, also states on his website:

> Edge sorting in many ways resembles card marking, which is an illegal activity. Edge sorting looks like a duck and quacks like a duck; the edge sorting team proceeds tactically in every way like a card–marking team. *However, an edge sorter is not a duck: he is not marking cards and he is not cheating.* Edge sorting is a method that takes advantage of the equipment and procedures a casino uses together with the casino's lack of awareness.[4]

In fact, there is a universal consensus among casino consultants who have published works on the subject that edge–sorting is legal advantage play and is not cheating. Edge–sorting is one of the oldest forms of advantage play known. Edge–sorters were playing in Las Vegas casinos during the 1950s, long before card counting at blackjack was discovered. Furthermore, there are references to edge–sorting from the 1700s, 1800s, and early 1900s that clearly describe the strategy as well as the concerns from card makers who acknowledged the challenges of cutting the cards

---

[4] http://apheat.net/2013/12/10/edge–sorting–101/, harvested December 22, 2013 (emphasis added).

perfectly to prevent asymmetries. See Steve Forte, *Casino Game Protection: A Comprehensive Guide* (Las Vegas: SLF Publishing, 2004); and Stanford Wong, *Winning Without Counting* (Las Vegas: Pi Yee Press, 1978). Edge–sorting is nothing new and casinos have long been aware of how to protect themselves from it.

18.     Defendants Foxwoods and Foxwoods Management either knew or should have known of the casino industry consensus that edge–sorting is legal advantage play and is not cheating. We know this because officer Michael Robinson included in his Investigative Report dated December 29, 2011 two reports from casino consultants that Foxwoods provided him in order to explain what edge–sorting was, and these reports are dated November 2, 2011 and November 9, 2011—almost a full two months before plaintiffs used their edge–sorting strategy at Foxwoods on December 24, 2011. One of these reports by Willy Allison explicitly states that edge–sorting is not cheating (Exhibit C, 22).

19.     Furthermore, careful examination of the November 2011 casino consultant reports reveal that Foxwoods and Foxwoods Management deliberately and maliciously defrauded plaintiffs. Both reports mention that Asian teams had been beating Las Vegas and Atlantic City casinos out of large sums of money at Mini–Baccarat by using edge–sorting strategy. *The Asian players mentioned in these reports are none other than plaintiffs themselves!* Plaintiff Cheung Yin Sun in particular had been beating casinos all over the world and her name and image was being widely circulated among the casino surveillance networks; they referred to her as the "Queen of Sorts." Upon information and belief, plaintiffs assert that Foxwoods and Foxwoods Management knew exactly who Cheung Yin Sun was and

knew of her edge–sorting capabilities prior to the December 24, 2011 session, but they let her play anyway. Foxwoods will certainly claim that they only discovered Sun's edge–sorting capabilities after analyzing the December 24, 2011 playing session. But that claim would be disingenuous and not to be believed. According to the August 6, 2012 MPTNGC Decision, the same plaintiffs in the case at bar played Mini–Baccarat at Foxwoods over a four–day period in November of 2011 and won $388,000 (Exhibit B, 6). Fully aware of their $388,000 loss, and possessing casino consultant reports in their files telling them exactly what to do in order to prevent edge–sorting, Foxwoods invited plaintiffs back to their casino to play Mini–Baccarat in December 2011. And they did so without implementing any of the countermeasures advised by consultants which would easily have thwarted edge–sorting. Why would any casino knowingly do this? The answer is obvious: they did it to cheat the plaintiffs out of $1.6 million and get their earlier losses back. As explained earlier, Foxwoods was "free–rolling" plaintiffs. They intended to keep plaintiffs' losses if they lost but never intended to honor their winnings if they won

20.     The MPTNGC was an integral part of this fraudulent scheme. Which is to say, all the proceedings before the MPTNGC were but an elaborate ruse to separate plaintiffs from their winnings; the MPTNGC completely disregarded the rights of the Plaintiffs. We know this because the initial decision by Chester Sicard, Director of the MPTNGC Inspection Division dated February 13, 2011, held that plaintiffs violated Title 53 Chapter 952 of the Connecticut Penal Code (Exhibit A, 2). That part of the ruling is illegal on its face. The MPTNGC does not have jurisdiction to interpret and enforce the Connecticut Penal Code; that authority belongs to the

Connecticut State's Attorney's Office. The MPTNGC appellate ruling corrected this illegal usurpation of Connecticut state law and based its ruling on MPGE internal Standards of Operation and Management. However even this ruling is so arbitrary and self–serving it is obvious. See especially footnote 15 of the appellate ruling where MPTNGC Chairman Henningsen essentially said that it was his job to enforce the MPGE Standards of Operations and Management regardless of "who, how, or why" those standards were violated, even if the fault lay wholly with Foxwoods Management and dealers (Exhibit B, 18). The MPTNGC's intent was to insure that the Mashantucket Pequot tribe kept plaintiffs' winnings no matter what, and to deny that Foxwoods casino has any duty whatsoever to protect its own games from legally recognized advantage play. In other words, the MPTNGC made it clear that they are a law unto themselves and not answerable to the laws and standards applicable to the national and international gaming industry.

21.     In signing the Escrow Agreement, plaintiffs stated they agreed that the "Gaming Commission" would have jurisdiction and authority to render a *"final and non-appealable"* decision in relation to this dispute (Exhibit D, 42, emphasis added). However none of the plaintiffs realized at the time they signed the Escrow Agreement that the "Gaming Commission" who would adjudicate their case is run by the very same Native American Indian tribe that owns and operates the Foxwoods casino and they would not receive fair and independent judicial review. Plaintiffs are now advised by their attorneys that Native American Indian Gaming Commissions are notorious for making arbitrary rulings to protect the interests of their tribe and hiding behind their sovereign immunity to preclude review, but they

did not know this at the time. Due to the fact that the Connecticut State Police were brought in to threaten criminal prosecution, plaintiffs were led to believe that the state of Connecticut would be involved in this dispute. In fact what happened was a "bait and switch." Plaintiffs were justifiably confident that they had done nothing illegal and would be cleared of all criminal charges by the state of Connecticut and get to keep their winnings. Instead, plaintiffs were tricked into agreeing to a civil resolution of their dispute under the sole jurisdiction of the Mashantucket Pequots. The fact that plaintiffs are Chinese nationals and non–native English speakers made it easy for the defendants to dupe them out of their winnings. Plainly put, the Escrow Agreement was an integral part of defendants' fraudulent scheme upon plaintiffs and it was procured by violating plaintiffs' civil rights under color of state law.

<strong><u>EACH INDIVIDUAL DEFENDANT'S ROLE IN VIOLATING<br>PLAINTIFFS' CIVIL RIGHTS SPELLED OUT</u></strong>

22.    The individually named defendants conspiratorial roles in violating plaintiffs' civil rights are spelled out as follows. Anne Chen was Foxwoods' Vice President of Asian Marketing and the signatory to the Escrow Agreement (Exhibit D, 44). Upon information and belief, plaintiff asserts that she also had a role in inviting plaintiffs back to Foxwoods to play after their winning session in November 2011 in order to defraud them by free–rolling them for their $1.6 million front money. Jeff DeClerk and Frank Leone were the primary casino managers responsible for wrongfully initiating criminal prosecution against plaintiffs for cheating, for converting their $1.6 million front money, for falsely arresting and imprisoning plaintiffs, and for not redeeming their approximately $1.148 million in

chips/winnings. Upon information and belief, plaintiff asserts that both men also had a role in inviting plaintiffs back to Foxwoods in order to defraud them by free–rolling them for their $1.6 million front money. Jeff DeClerk was the Foxwoods' Surveillance Senior Investigator, and Frank Leone was Foxwoods' Director of Table Games (Exhibits A, B, C, D). Detective Michael Robinson was the Connecticut State Police Officer who wrongly intervened in this dispute and violated plaintiffs' civil rights upon Foxwoods' behest (Exhibit C). Edward Gasser, George Henningsen, Michael Santagata, and Chester Sicard are all officers of the court for the MPTNGC (Exhibits A, B). They, too, had an integral role in the wrongs done to plaintiffs by failing to protect their civil rights, and by engaging in a conspiratorial scheme to deprive plaintiffs of their private property in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution. These defendants plainly denied plaintiffs a neutral decision maker.

## CAUSES OF ACTION

42 U.S.C. § 1983 actions exist where there is a "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 929 (1982). Jointly and severally, defendants acted under color of state law by using the Connecticut State Police to assist them in the following wrongs against plaintiffs.

23.     Defendants committed intentional fraud upon plaintiffs by inviting them to play Mini–Baccarat at Foxwoods in December 2011, intending to keep their losses if they lost but never intending to honor their winnings if they won. Fed. R. Civil Pro. 9(b) requires that "circumstances constituting fraud … shall be stated with

particularity." In order to prevail upon a claim of intentional fraud/intentional misrepresentation under Connecticut law, a plaintiff must prove the following.

> 1) that the defendant made a false representation as a statement of fact, 2) the statement was untrue and the defendant knew it was untrue, 3) the defendant made the false statement in order to induce the plaintiff to rely on the false statement, and 4) the plaintiff did rely on the false statement to (his/her) detriment.

See *Dalia v. Lawrence*, 226 Conn. 51, 78 (1993); *Miller v. Appleby*, 183 Conn. 51, 55 (1981); *DeLuca v. C.W. Blakeslee & Sons, Inc.*, 174 Conn. 535, 546 (1978). In meeting this burden of proof, plaintiffs point out that there are two ways the common law recognizes that defendants can make false representations.

> *Fraudulent Concealment* is defined as existing where one party to a transaction, by concealment or other action, intentionally prevents the other from acquiring material information. Thus a defendant is subject to liability for a fraudulent misrepresentation if he paints over and so conceals a defect in a chattel or a building that he is endeavoring to sell to the plaintiff, and thus induces the plaintiff to buy it in ignorance of its defective character.

> Restatement (Second) Torts §550

> *Fraudulent Nondisclosure* arises where:

1. One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

2. One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and (c) subsequently acquired information that he knows will make untrue or misleading a previous

representation that when made was true or believed to be so; and (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) Torts § 551

Plaintiffs are confident they can meet this burden of proof at trial. And if plaintiffs can prove defendants committed intentional fraud against them they are entitled to punitive damages. The Connecticut Unfair Trade Practice Act (CUTPA) provides for punitive damages in cases such as the one at bar. See Connecticut General Statutes § 42–110g(a).

24.     Defendants converted plaintiffs' $1.6 million in front money deposits.

25.     Defendants falsely imprisoned plaintiffs for three days in their hotel room while they desperately tried to recover their converted front money deposits.

26.     Defendants seized plaintiffs' approximate $1.148 million in chips/winnings by false arrest and wrongful threat of criminal prosecution.

27.      Defendants forced plaintiffs to assent to a "final and non-appealable decision" by the MPTNGC regarding the ultimate ownership of their share in the approximately $1.148 million in chips/winnings.

28.     Defendants denied plaintiffs the right to independent counsel to represent them before the MPTNGC, which amounted to a governmental taking of their private property without due process of law in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution.

29.     Defendants made a mockery of plaintiffs' civil rights with the illusory proceedings held by the MPTNGC, which amounted to a governmental taking of their private property without due process of law in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution. Defendants plainly denied plaintiffs a neutral decision maker. The MPTNGC never intended on granting the plaintiffs a fair trial under any circumstances. Their intent all along was to deprive plaintiffs of their rightfully won winnings no matter what.

## DAMAGES

30.     For the above wrongs, plaintiffs seek consequential damages against defendants jointly and severally in the amount of approximately $3 million. The breakdown of these consequential damages is as follows. Plaintiffs seek $1.6 million in converted front money deposits, plus $1.148 million in winnings, plus $100,000 for each plaintiff for violations of their civil rights, plus $50,000 for legal fees for proceedings before the MPTNGC, for a total of approximately $3 million. Plaintiffs point out that the civil rights wrong committed against them were grievous and are deserving of a large amount of damages, and perhaps more damages than this if facts come forth in discovery that warrant it.

31.     Plaintiffs seek punitive damages against defendants jointly and severally to the fullest extent allowed by federal and state law.

32.     Plaintiffs seek interest on the consequential and punitive damages, plus reasonable attorneys fees and costs of court against defendants jointly and severally.

## SOVEREIGN IMMUNITY DEFENSES ANTICPATED

In cases like the one at bar, Native American Indian casinos typically shield themselves from liability by asserting sovereign immunity. In anticipation of that defense, plaintiffs offer the following arguments.

33.     First, the Mashantucket Pequots may not be a genuine Native American Indian tribe. Author and attorney Jack Benedict wrote a well–researched book titled *Without Reservation: The Making of America's Most Powerful Indian Tribe and Foxwoods the World's Largest Casino* (New York: HarperCollins, 2001). In his book, Benedict argued that the so–called "Mashantucket Pequots" who built Foxwoods were not a genuine Native American Indian tribe and that a fraud was wrought upon the people of Connecticut and the U.S. Congress. If Benedict's well–researched claims are true and plaintiffs can prove those claims by means of their discovery power in the case at bar, then the Mashantucket Pequot Gaming Enterprise would merely be a Connecticut business entity like any other, capable of suing and being sued in the state and federal courts.

34.     Second, assuming arguendo that the Mashantucket Pequots are a genuine Native American Indian tribe, there is a line of federal cases in support of the proposition that 42 U.S.C. § 1983 actions cannot be maintained against Native American Indian tribes. These cases all cite back to the U.S. Supreme Court case of *Inyo County vs. Paiute–Shoshone Indians of the Bishop Community*, 538 U.S. 701 (2003). But, upon careful reading, the court in *Inyo County* only briefly mentioned this issue in dicta. The unanimous decision states on page 702, in relevant part: "*Although this case does not squarely present the question*, the Court assumes that

tribes, like States, are not subject to suit under § 1983" (emphasis added). In fact, the question of whether § 1983 actions can be brought against Native American Indian casinos is a novel one, and the right case has yet to come along to properly litigate it. Plaintiffs aver that the case at bar is precisely the right case to litigate a § 1983 action, especially since Foxwoods acted under color of state law in depriving plaintiffs of their civil rights by acting in concert with the Connecticut State Police to falsely arrest plaintiffs, false imprison them and to wrongfully assist Foxwoods in the conversion of plaintiffs' front money and winnings in furtherance of their overall scheme to defraud them.

35. Furthermore, plaintiffs' right to sue the individually named defendants for violating their civil rights has been well established by case law precedent. The U.S. Supreme Court has consistently held that the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908) should apply to tribal officials acting outside the scope of their official duties or in violation of federal law, and in such cases tribal officials cannot use tribal sovereign immunity to shield themselves from suit. See *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 59 (1978) and *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Nation,* 498 U.S. 505, 514 (1991). In fact, a case very analogous to this one is currently working its way through the federal courts. In *Pistor v. Garcia*, the Mazatzal Casino in Arizona (a business enterprise of the Tonto Apache Tribe) acted in concert with Arizona State Police officers to arrest a group of patrons who had won a large sum of money through honest advantage play. The officers wrongfully seized the patrons' vouchers and turned them over to the tribal authorities for civil resolution. The trial court found

that the individual casino employees and the Arizona police officers violated plaintiffs' civil rights and awarded plaintiffs the damages they sought. The defendants appealed and the case is awaiting resolution in the United State Court of Appeals for Ninth Circuit, No. 12–17095 (2014). The plaintiffs in *Pistor v. Garcia* rely primarily upon two cases as precedent, *Evans v. McKay,* 869 F.2d 1341 (9th Cir. 1989) and *Maxwell v. County of San Diego,* 697 F.3d 941 (9th Cir. 2012). While the Indian tribe in the *Evans* case was dismissed on the basis of sovereign immunity, as to the individual defendants, the court held:

> Insofar as the individual tribal defendants are concerned .... [I]t is well established that private parties who act in concert with officers of the state are acting under the color of state law within the meaning of section 1983. *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. at 930-31, 102 S.Ct. at 2750-51.

*Evans* at 869 F.2d 1348 (9th Cir. 1989). The *Maxwell* court strengthened and clarified the earlier *Evans* ruling by stressing that "suits over plainly unlawful acts are individual capacity suits by definition and could have rested on that ground." *Maxwell v. County of San Diego,* 697 F.3d at 954 (9th Cir. 2012). This exemplified the holding in *Evans* at n.9, noting that, "If appellants are able to prove that the individual tribal defendants acted in concert with the police defendants, whose actions we have here held to be 'under color of state law,' their actions cannot be said to have been authorized by tribal law."

36.     Lastly, as to officers of the tribal court, there is U.S. Supreme Court precedent that holds that officers of state courts are entitled to absolute immunity from suit. For example, *Pierson v. Ray*, 386 US 547 (1967) held that state court judges are absolutely immune from 42 U.S.C. § 1983 actions even if they act

unconstitutionally. However tribal court judges are not judges in U.S. state courts; as such, plaintiff contends that judicial immunity under U.S. law does not apply. In the case at bar, the tribal court judges were in truth and in fact merely private parties who acted in concert with an officer of the state (Connecticut State Detective Michael Robinson) precisely in order to deny plaintiffs a neutral decision maker. Plaintiff contends the same distinction applies to defendants Edward Gasser and Michael Santagata. Both were counsel for the Mashantucket Pequot tribe (Santagata was in–house counsel and Gasser was outside counsel). Both will probably cite *Simms v. Seaman*, 308 Conn. 523 (2013), wherein the Connecticut Supreme Court held that private attorneys are absolutely immune from suits for their actions in furtherance of representation of their clients, even if they committed fraud or professional misconduct against the opposing party. However, plaintiffs contend that *Simms* is distinguishable for the same reason that *Pierson* is distinguishable. Neither defendant was practicing before a Connecticut state court; they were practicing before a sovereign tribal court with no more connection to the U.S. state courts than courts in the nation of Canada. Judicial and litigation immunity under U.S. law exists in order to safeguard the sanctity of U.S. state and federal courts. It would be an abomination to apply immunity under U.S. law to officers of foreign courts that violate the U.S. Constitution and usurp the power of our state and federal courts. The officers of the Mashantucket Pequot tribal courts have been pushing the limits of their sovereign immunity for decades; this time they went too far. For these reasons, the officers of the tribal court should be subject to this § 1983 suit along with the rest of the individually named defendants per the precedent cited in

paragraph 35, *supra*. Whether officers of the tribal court knew beforehand or joined the conspiracy in progress, plaintiffs aver upon information and belief that they acted in concert with the Connecticut State Police to deny plaintiffs' constitutional rights.

## **PRAYER FOR RELIEF**

WHEREFORE, premises considered, plaintiffs pray that this honorable court:

1.      Enter a judgment including an award of consequential damages against defendants jointly and severally for approximately $3 million as detailed in paragraph 29, *supra.*

2.      Enter a judgment including an award of punitive damages against defendants jointly and severally to the fullest extent allowed by federal and state law.

3.      Award plaintiffs interest on the consequential and punitive damages plus reasonable attorneys fees.

4.      Award plaintiffs any other general and equitable relief to which they may be entitled.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Respectfully submitted, this the 21ᵗʰ day of August 2014.

Plaintiffs Cheung Yin Sun, Long Mei Fang and Zong Yang Li

By: /s

Sebastian O. DeSantis

Counsel for plaintiffs

Plaintiffs' lawyers:

(pending pro hoc vice motion)
Marvin Vining, Esq.
MS Bar No. 8535
Attorney at Law, LLC
P.O. Box 250
Monticello, MS 39654
(601) 842–2589
marvinvining@mac.com

Sebatian O. DeSantis, Esq.
CT Bar No. CT20116
DeSantis Law Firm
345 State Street
New London, CT 06320
(860) 439–0407
desantis@desantislaw.org

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2014 a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

        /s/Sebastian O DeSantis
        Sebastian O. DeSantis